UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | | |
|---|---|---|
| Phillip Michael Hook, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. 25-4188 |
| | ) | |
| Tim Rave, in his official capacity as | ) | |
| President of the South Dakota Board of | ) | |
| Regents, Sheila K. Gestring, in her official | ) | |
| capacity as President of the University | ) | |
| of South Dakota, and Bruce Kelley, in his | ) | |
| official capacity as Dean of the University | ) | |
| of South Dakota College of Fine Arts, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**Memorandum in Support of**
**<u>Motion for Temporary Restraining Order</u>**

## Table of Contents

I.  Summary of case and statement of facts                                      4

II.  Professor Hook's Facebook posts are core protected political speech         6

    A.  First Amendment protection of political speech is extremely       6
        broad—and even more so for university professors

    B.  Professor Hook's Facebook posts are protected by the First       9
        Amendment

    C.  The *Pickering* exception does not apply because there is no      15
        evidence that Professor Hook's speech "created workplace
        disharmony, impeded the plaintiff's performance or impaired
        working relationships"

III.  The policies defendants rely on do not justify retaliation against        19
    Professor Hook, and as applied to him are vague, overbroad,
    and unconstitutional

IV.  This Court can and should restrain defendants from violating              22
    Professor Hook's First Amendment rights

    A.  Defendants should be restrained from violating the First          22
        Amendment

    B.  Professor Hook is entitled to injunctive relief                   27

        1.  Standards for granting a temporary restraining order         27

        2.  Professor Hook is likely to prevail on the merits            28

        3.  Any loss of First Amendment rights, no matter how brief,     28
           is irreparable harm

        4.  The other requirements for injunctive relief are met         29

C.    A bond should not be required                                    30

V.    Will public university professors be free to speak on political issues,    31
      or will they be limited to speech approved by the government?

VI.   Plaintiff has provided proper notice to defendants                32

VII.  Conclusion                                                        33

I.    **Summary of case and statement of facts**

"If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein.  If there are any circumstances which permit an exception, they do not now occur to us."  *West Virginia State Bd. of Education v. Barnette*, 319 U.S. 624, 642 (1943).

So wrote Justice Robert Jackson for the Court, at a time when the outcome of World War II was still very much in doubt, holding unconstitutional under the First Amendment a state law that required public school students to salute the United States flag and pledge allegiance to it.

Today some political leaders and public officials are engaged in an ongoing, highly public campaign to limit speech by punishing those who express opinions that conflict with their political views.  Their actions have the purpose and effect of sending a clear message: speak publicly and we will attack you, shame you, and if we can, punish you.  University of South Dakota Professor Phillip Michael Hook finds himself about to be terminated from employment because—on his own time—he publicly expressed a political opinion.  Within hours, he thought better of

his post, removed it, and issued what he termed a "public apology to those who were offended."  At the end he added "Om Shanti, "a Sanscrit prayer for peace. www.yogapedia.com (last visited September 22, 2025).

Professor Hook's first post angered powerful politicians.  Speaker of the House and 2026 Governor candidate Jon Hansen immediately contacted USD President Sheila Gestring and called on her to fire Professor Hook.  Hook Declaration ("Declaration") Exhibit 4.  The South Dakota Board of Regents immediately voted to terminate Professor Hook.  Declaration Exhibit 5.  Governor Rhoden issued a Facebook post saying he was "shaking mad."  He wrote: "The Board of Regents intends to FIRE this University of South Dakota professor, and I'm glad."  Declaration Exhibit 6.  Less than 48 hours after Professor Hook's posts, USD Dean of the College of Fine Arts Bruce Kelley, with the support of President Gestring, confirmed this in a letter he hand-delivered to Professor Hook. Declaration Exhibit 7.

Governor Rhoden and the Legislature control USD's budget.  Speaker Hansen has substantial power over USD's budget.  President Gestring and Dean Kelley serve at the pleasure of the Board of Regents.  Governor Rhoden and Speaker Hansen have substantial power concerning the Board of Regents' decisions whether

President Gestring and Dean Kelley get to keep their jobs. President Gestring and Dean Kelley had no choice how to proceed in this matter—other than to resign if they chose not to be part of it—because it was and is their duty to protect the institution of the University of South Dakota. And naturally they want to keep their jobs.[1]

Professor Hook's posts were firmly within his First Amendment right to speak. Nothing he said is more than protected political argument.

The First Amendment protects political speech even though it offends some. This lawsuit seeks to prohibit defendants from retaliating against Professor Hook for exercising his First Amendment right to speak on political matters.

## II.    Professor Hook's Facebook posts are core protected political speech

### A.    First Amendment protection of political speech is extremely broad—and even more so for university professors

Professor Hook offended some people by one off-work comment on a matter of public concern expressing strong dislike for a right-wing activist he characterized

---

[1]On September 19, 2025, the President of Texas A & M resigned after the Texas Lieutenant Governor sharply criticized him for "taking the side of the professor" after Texas politicians criticized her for her views about gender. https://www.newsweek.com/texas-am-president-resigning-amid-backlash-2132382 (last visited September 22, 2025).

as "hate spreading." He asked where "all this concern" was when the politicians in Minnesota were assassinated this summer, when the school shootings happened (students in Colorado were shot the same day Mr. Kirk was shot), and when the Capitol Police were assaulted on January 6, 2021. Within hours of his post, he took it down, commenting: "Apparently my frustration with the sudden onslaught of coverage concerning a guy shot today led to a post I mow [sic] regret posting. I'm sure many folks fully understood my premise but the simple fact that some were offended led me to remove the post. I extend this public apology to those who were offended. Om Shanti." Complaint Exhibits 2 and 3.

Governor Rhoden, Speaker of the House Hansen, and others were offended. Now Professor Hook is about to be fired. But ideas offensive to some are protected by the First Amendment. This protection is at the core of the American experiment. Protection extends to all viewpoints, without discrimination. The First Amendment protects us all—those who are unpopular today, as well as those who may be unpopular tomorrow. *Healy v. James*, 408 U.S. 169, 188 (1972), quoting *Community Party v. SACB*, 367 U.S. 1, 137 (dissenting opinion) (1961) ("I do not believe that it can be too often repeated that the freedoms of speech, press, petition and assembly

guaranteed by the First Amendment must be accorded to the ideas we hate or sooner or later they will be denied to the ideas we cherish.")

Even advocating for the assassination of the President—light-years away from anything Professor Hook said or ever would say—is protected. On March 30, 1981, a clerical employee in a Texas county Constable's office, upon hearing of the attempt to assassinate President Ronald Reagan, said "If they go for him again, I hope they get him." She was fired. The Supreme Court held that her First Amendment right to speak outweighed her law-enforcement employer's interest in terminating her. It ruled that her firing violated her First Amendment right to speak. *Rankin v. McPherson*, 483 U.S. 378, 392 (1987).

University professors have uniquely strong protection for political speech. "We have long recognized that, given the important purpose of public education and the expansive freedoms of speech and thought associated with the university environment, universities occupy a special niche in our constitutional tradition." *Grutter v. Bollinger,* 539 U.S. 306, 329 (2003). "Our Nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us and not merely to the teachers concerned." *Keyishian v. Board of Regents*, 385 U.S. 603 (1967). "The vigilant protection of constitutional freedoms is nowhere more vital than in the

8

community of American schools." *Shelton v. Tucker*, 364 U.S. 479, 487 (1960). "[T]he areas of academic freedom and political expression" are "areas in which the government should be extremely reticent to tread." *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957).

**B.    Professor Hook's Facebook posts are protected by the First Amendment**

The First Amendment is "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *New York Times v. Sullivan*, 376 U.S. 254, 270 (1964). Speech about "public affairs is more than self-expression; it is the essence of self-government." *Garrison v. Louisiana*, 379 U.S. 64, 74-75 (1964). "[S]peech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Connick v. Myers*, 461 U.S. 138, 145 (1983) (internal quotation marks omitted).

Professor Hook's speech deals with profound and timely public issues: Who was Charlie Kirk? What is his legacy? Should we applaud or decry what he promoted? How should we react to his murder? How does the reaction to his murder compare with reaction to the recent murders of Minnesota House Speaker Melissa Hortman and her husband Mark Hortman, and the attempted murders of

Minnesota State Senator John Hoffman and his wife Yvette Hoffman? How does it compare with the reaction to the shootings at Evergreen High School in Colorado that occurred the same day? Or with all the previous school shootings? How does it compare with the decision to pardon all the people who assaulted police officers on January 6, 2021, to try to overthrow an election? What lessons should we take to heart from these questions? How should these questions, and their answers, inform what we say and do?

Mr. Kirk was a public figure. In 2016, he established a "Watchlist" of allegedly "leftist" university teachers that "Made Some Professors' Lives a 'Living Hell.'" Complaint Ex. 1. He decried the Rev. Dr. Martin Luther King, Jr., as "awful." Complaint Ex. 2 at 10. He said that Catholic charities "are one of the biggest reasons why we have the open border crisis on the southern border," and that they "train the sex traffickers how to smuggle the women across the border." Complaint Ex. 2 at 11. He called the Civil Rights Act an "anti-white weapon." Complaint Ex. 2 at 11. He claimed that FBI agents executing a search warrant at Mar-A-Lago were "doing the work that brown shirts would do. That's how you get Auschwitz." Complaint Ex. 2 at 11. He alleged that federal employees are

"worthless parasites."   Complaint Ex. 2 at 13.   And on and on and on and on.

Complaint Ex. 2 at 8 to 19.

Whether Mr. Kirk's statements were true is irrelevant.   Mr. Kirk was a public

figure speaking about matters of public and political concern.   So Professor Hook's

Facebook posts about Kirk were about matters of public concern.   They are entitled

to the highest level of First Amendment protection.   Speech that can "be fairly

considered as relating to any matter of political, social, or other concern to the

community" involves matters of public concern.   *Connick v. Myers*, *supra*, 461 U.S.

at 146.   Whether speech is—in the view of some—"inappropriate" or "controversial"

is "irrelevant to the question whether it deals with a matter of public concern."

*Rankin v. McPherson*, 483 U.S. 378, 387 (1987).

A group that picketed the funeral of a soldier, Matthew Snyder, bearing signs

such as "Thank God for Dead Soldiers" was protected by the First Amendment.   The

group's "choice to convey its views in conjunction with" the soldier's funeral was

"particularly hurtful to many, especially to Matthew's father."   *Snyder v. Phelps*, 562

U.S. 443, 456 (2011).   Almost everyone finds such behavior despicable.   Yet "If there

is a bedrock principle underlying the First Amendment, it is that the government

may not prohibit the expression of an idea simply because society finds the idea

offensive or disagreeable." *Snyder v. Phelps, supra*, 562 U.S. at 458, quoting *Texas v. Johnson*, 491 U.S. 397, 414 (1989). And "the point of all speech protection . . . is to shield just those choices of content that in someone's eyes are misguided, or even hurtful." *Snyder v. Phelps, id.*, quoting *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U.S. 557, 574 (1995).

Judged by these standards, Professor Hook's first Facebook post—which was up for only a few hours before he took it down, and apologized to those it offended—is unquestionably protected. The post says that he doesn't care about Kirk; that "[a]pparently he was a hate spreading Nazi"[2]; that Hook doesn't pay "close enough attention to the idiotic right fringe to even know who [Kirk] was"; that Hook's family "deserved better" and "[m]aybe good people could now enter

---

[2]"Nazi" has two meanings. One is "right-wing authoritarianism generally." The other is "political and social doctrines advocated by Adolf Hitler and his minions, esp. those avowing Aryan racial superiority and fostering totalitarianism and the expansion of the German state." *Black's Law Dictionary* (12th ed. 2024) at 1236.

Calling someone a "Nazi" is not even defamatory. *Frank v. Fine*, 2024 U.S. Dist. Lexis 2891 * 7-8, 2024 WL 473718 (M. D. Fla.), *adopted and confirmed*, 2024 U.S. Dist. Lexis 23527, 2024 WL 473720 ("not actionable defamation 'because of the tremendous imprecision of the meaning and usage of such terms in the realm of political debate.' In other words, being called a Nazi or coward are not verifiable statements of fact that would support a defamation claim.") (cleaned up).

their lives"; and asks "where was all this concern when the politicians in Minnesota were shot? And the school shootings? And Capital [sic] Police?" Hook concludes "I have no thoughts or prayers for this hate spreading Nazi. A shrug, maybe." Declaration Exhibit 2. In sum, the post expresses strong dislike for what Kirk "apparently" stood for; little regret for his death; and asks important questions about why the reaction to Kirk's murder is so much different than the reaction to other events, including the political murders in Minnesota this summer.

Professor Hook's speech pales in comparison to the speech of the President of the United States, who regularly praises and encourages political violence against his real and perceived enemies. Memorandum Ex. 2 at 1-6. The President's threats have real-world consequences, including on prosecutors and judges, yet he keeps making them. Memorandum Ex. 2 at 6-7 ("within minutes of his attacks, his acolytes respond. . . [leading to] dozens of potentially violent threats directed at [Georgia prosecutor Fani] Willis and her family"). Judges in the President's cases "have faced persistent threats to their personal safety, including 'swatting' calls directed at their homes and a racist voicemail threatening murder." Memorandum Ex. 2 at 7. The President's comments about *right-wing* political violence have been mild at best.

13

Memorandum Ex. 2 at 20-24.  And he pardoned everyone who attacked the Capitol and its police officers to capture and hang the Vice-President on January 6, 2021.

By contrast, Professor Hook never has and never would suggest or promote violence as a solution to anything.  His post angered the wrong people: Governor Rhoden, Speaker Hansen, the Board of Regents, and some who share their political views.  But the state may not punish speech it dislikes.  "Government officials cannot attempt to coerce private parties in order to punish or suppress views that the government disfavors."  *NRA of America v. Vullo*, 602 U.S. 175, 180 (2024).  This is not a novel idea.  "Six decades ago, this Court held that a government entity's 'threat of invoking legal sanctions and other means of coercion' against a third party 'to achieve the suppression' of disfavored speech violates the First Amendment."  *NRA of America v. Vullo*, *id.*, quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963).  So Professor Hook's Facebook posts are protected by the First Amendment.

"Official reprisal for protected speech 'offends the Constitution [because] it threatens to inhibit exercise of the protected right[.]'" *Hartman v. Moore*, 547 U.S. 250, 256 (2006), quoting *Crawford-El v. Britton*, 523 U.S. 574, 588 n.10 (1998).  "[A]s a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions' for engaging in protected speech."  *Nieves v.*

14

*Bartlett*, 587 U.S. 391, 398 (2019), quoting *Hartman v. Moore*, *supra*, 547 U.S. at 256.

*NRA of Am. v. Vullo*, 602 U.S. 175, 188 (2024) (officials may not "use the power of the State to punish or suppress disfavored expression.") Such actions are "presumptively unconstitutional." *Rosenberger v. Rector and Visitors*, 515 U.S. 819, 830 (1995).

    **C.    The *Pickering* exception does not apply because there is no evidence that Professor Hook's speech "created workplace disharmony, impeded the plaintiff's performance or impaired working relationships"**

*Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968), sought to balance a public employee's right to free speech with "the interest of the State, as an employer, in protecting the efficiency of the public services it performs through its employees." In applying *Pickering* to university professors, the crucial issue is how to define the legitimate interests of the university. "In the distinctive context of universities, the government cannot, consistent with First Amendment values, identify the best interests of the institution with the interests and preferences of government officials. . . . For universities to punish professors for their extramural speech precisely because such speech is controversial or critical of incumbent government officials annihilates the very purpose of protecting speech." Keith E. Whittington, *What Can*

15

*Professors Say in Public? Extramural Speech and the First Amendment*, 73 Case W. Rsrv. L. Rev. 1121, 1152 (2023).

In words that presciently anticipate the present moment, Professor Whittington wrote: "It has become commonplace for those offended by the public speech of university professors to demand that the faculty member be fired or otherwise sanctioned for speaking in public.  Politicians . . . have pushed for universities to retaliate against professors who have offended their sensibilities by something that they have said."  But "[t]his form of 'disruption' to the university campus cannot, consistent with academic freedom and free speech values, be the basis for employer punishment of a member of the faculty.  'Community reaction' to controversial ideas should be expected on a university campus.  A controversial social media post by a professor might spur angry phone calls or student protests but universities have a responsibility to protect the space for free speech rather than become instruments for silencing speech."  Whittington, *supra*, 73 Case W. Rsrv. L. Rev. at 1158.

*Pickering* applies only if a university can prove that it is retaliating against a professor because the professor's speech disrupted the university's operations.  "Where there is no evidence of disruption, resort to the *Pickering* factors is

16

unnecessary because there are no government interests in efficiency to weigh against the First Amendment interests." *Mayfield v. Haahr*, 122 F.4th 1046, 1053 (8th Cir. 2024), quoting *Henry v. Johnson*, 950 F.3d 1005, 1011 (8th Cir. 2020). Only "if there is evidence of disruption" does a "so-called *Pickering* balancing test" come into play. *Noon v. City of Platte Woods*, 94 F.4th 759, 765 (8th Cir. 2024).

Critically, the government can meet its burden to show disruption sufficient to invoke *Pickering* only with specific evidence, not general allegations. "To trigger the *Pickering* balancing test, a public employer must, with specificity, demonstrate the speech at issue created workplace disharmony, impeded the plaintiff's performance or impaired working relationships." *Noon v. City of Platte Woods*, 94 F. 4th 759, 765 (8th Cir. 2024), quoting *Lindsley v. City of Orrick*, 491 F.3d 892, 900 (8th Cir. 2007). This is a threshold issue and the burden is on the state. The state must "establish that the speech 'created workplace disharmony, impeded [Hook's] performance, . . . impaired working relationships,' or otherwise 'had an adverse impact on the efficiency of the [university's] operations.'" *Melton v. City of Forrest City*, 147 F.4th 896, 902 (8th Cir. 2025), quoting *Henry v. Johnson*, 950 F.3d 1005, 1011 (8th Cir. 2020) (ellipsis in *Melton*). Only if the government meets its burden "will we

17

do a full *Pickering* balancing test and weigh these interests against each other."
*Melton*, *supra*, 147 F.4th at 902.

Melton—decided just last month—requires that the government's evidence of disruption be concrete. "Vague and conclusory" concerns are insufficient, because they "run[] the risk of constitutionalizing a heckler's veto." *Melton* at 903. "Bare allegations" are insufficient. *Id.* The question is how the speech allegedly "*actually* affected the government's ability*" to deliver services. *Id.* (italics by Eighth Circuit).

In *Melton*, the employer was a fire department, so the services in question were "fighting fires and protecting public safety." *Id.* Here, the employer is the University of South Dakota, so the services in question are producing and disseminating knowledge; fostering free inquiry and spirited debate; educating everyone in the university community and beyond what it means to live in a modern, democratic, free society; and demonstrating in practice how the First Amendment protects us all.

In the present case, the immediate retaliation against Professor Hook for his first Facebook post by the Governor, the Speaker of the House, and the Board of Regents show that Professor Hook is being punished for his speech—not because his speech allegedly "created workplace disharmony, impeded the plaintiff's

18

performance or impaired working relationships." So the State cannot meet its burden to invoke *Pickering*. The First Amendment protects Professor Hook's speech and bars defendants from retaliating against him.

## III.    The policies defendants rely on do not justify retaliation against Professor Hook, and as applied to him are vague, overbroad, and unconstitutional

Defendants base their attempt to retaliate against Professor Hook on his alleged violation of South Dakota Board of Regents policies 4.4.8 § 5.1 and 1.6.1 § C.1.3. The first prohibits "Neglect of duty, misconduct, incompetence, abuse of power or other actions that manifest an unfitness to discharge the trust reposed in public university faculty members or to perform assigned duties[.]" The second states: "Faculty members are members of a learned profession. When they speak or write as private citizens on matters of public concern, they must be free from institutional censorship or discipline, but their special position in the community imposes special obligations. As learned people and as educators, they should remember that the public may judge their profession and their institution by their utterances. Hence, they should at all times be accurate, show respect for the opinions of others and make every effort to indicate when they are not speaking for the institution." Hook Declaration Exhibit 7.

19

Policy 1.6.1 § C.1.3. is substantially identical to the 1940 Statement of Principles on Academic Freedom and Tenure of the American Association of University Professors. https://www.aaup.org/sites/default/files/1940%20Statement.pdf (last visited September 22, 2025). The AAUP states that it should "be interpreted in keeping with the 1964 'Committee A Statement of Extramural Utterances.'" *Id.* The 1964 Committee Statement provides: "The controlling principle is that a faculty member's expression of opinion as a citizen cannot constitute grounds for dismissal unless it clearly demonstrates the faculty member's unfitness for his or her position. Extramural utterances rarely bear upon the faculty member's fitness for the position. Moreover, a final decision should take into account the faculty member's entire record as a teacher and scholar." *Id.*

Professor Hook's Facebook posts cannot possibly justify his dismissal under these rules. His first post is the only supporting evidence defendants cite ("The evidence to support this action includes a social media post from your personal account that we have attached as an addendum for reference.") Declaration Exhibit 7. Nothing in it "clearly demonstrates" Professor Hook's "unfitness for his or her position" as a Professor of Art.

As applied to retaliate against Professor Hook for his protected First Amendment speech, these standards are extraordinarily vague. No one can know what they mean, other than perhaps "Don't criticize people who the Governor and Speaker of the House approve of" and "Don't ask impertinent questions like why the reaction to Mr. Kirk's murder is so much different from the reaction to the murders of Minnesota House Speaker Hortman and her husband and the attempted murders of Minnesota State Senator Hoffman and his wife."

"The requirement that government articulate its aims with a reasonable degree of clarity ensures that state power will be exercised only on behalf of policies reflecting an authoritative choice among competing social values, reduces the danger of caprice and discrimination in the administration of the laws, enables individuals to conform their conduct to the requirements of law, and permits meaningful judicial review." *Roberts v. United States Jaycees*, 468 U.S. 609, 629 (1984). The Board of Regents policies, as applied to Professor Hook's speech, fail all these requirements. The policies are "so vague that [persons] of common intelligence must necessarily guess at [their] meaning and differ as to [their] application," so they "violate[] the first essential of due process of law." *Roberts, id.*, quoting *Connally v. General Construction Co.*, 269 U.S. 385, 391 (1926).

Policies that allow the government to punish protected First Amendment speech are overbroad. If these policies apply to Professor Hook's Facebook posts, they are unconstitutional. To the extent the policies allow the university to discriminate based on Professor Hook's opinions, they are unconstitutional. *Iancu v. Brunetti*, 588 U.S. 388, 393 (2019) ("The government may not discriminate against speech based on the ideas or opinions it conveys.") The government may not discriminate against ideas it finds offensive. *Matal v. Tam*, 582 U.S. 218, 223 (2017) (law is unconstitutional because it violates "a bedrock First Amendment principle: Speech may not be banned on the ground that it expresses ideas that offend.")

## IV. This Court can and should restrain defendants from violating Professor Hook's First Amendment rights

### A. Defendants should be restrained from violating the First Amendment

Federal courts in this District have repeatedly restrained state actors from violating the First Amendment. *Dakotans for Health v. Ewing*, 2023 U.S. Dist. Lexis 109558; 2023 WL 4118599 (D.S.D., Western Div.) (granting temporary restraining order against Lawrence County restrictions on petition circulators); *Dakotans for Health v. Anderson*, 677 F. Supp. 3d 977 (D.S.D., So. Div. 2023) (granting preliminary injunction against Minnehaha County restrictions on petition circulators); *SD Voice*

*v. Noem*, 557 F. Supp. 3d 937 (D.S.D., No. Div. 2021), *aff'd in part and rev'd in part* 60 F.4th 1071 (holding South Dakota's one-year pre-election filing requirement for citizen initiatives unconstitutional); *Dakotans For Health v. Noem*, 543 F. Supp. 3d 769 (D.S.D., So. Div. 2021), *aff'd* 52 F.4th 381 (8th Cir. 2022) (holding Senate Bill 180 (2020) unconstitutional); *SD Voice v. Noem*, 432 F. Supp. 991 (D.S.D., No. Div. 2020) (holding House Bill 1094 (2019) unconstitutional), *appeal dismissed in part as moot and for lack of jurisdiction*, 987 F.3d 1186 (8th Cir. 2021); and *SD Voice v. Noem*, 380 F. Supp. 3d 939 (D.S.D., No. Div. 2019) (holding Initiated Measure 24 unconstitutional).

In all these cases, state officials were enjoined in federal court from violating the First Amendment. *Heartland Acad. Cmty. Church v. Waddle*, 427 F.2d 525, 530 (8th Cir. 2005) ("the *Ex Parte Young* doctrine describes an exception to Eleventh Amendment immunity for a state official where the relief sought is prospective and not compensatory. A federal court may therefore issue an injunction to prevent state officials from violating the Constitution without running afoul of the Eleventh Amendment.") (citation omitted). This case seeks prospective relief against state officials to prevent them from violating Professor Hook's First Amendment rights, so it is within the core of *Ex Parte Young*.

23

Professor Hook is not required to exhaust his potential "administrative remedies"—a "personal conference" with Dean Bruce Kelley—who in accordance with directions from Governor Rhoden, House Majority Leader Hansen, and the unanimous Board of Regents has already stated his intention to fire him. Declaration Exhibit 7. *Patsy v. Bd. of Regents*, 457 U.S. 496 (1982) (exhaustion of state administrative remedies is not required to sue under § 1983). *Patsy* applied this principle to a civil rights lawsuit against a state university, the same context as here.

This case is ripe because Dean Kelley's stated intention, supported by Governor Rhoden, Speaker Hansen, and the Board of Regents, is to terminate Professor Hook's employment. *Ohio Civil Rights Comm'n v. Dayton Christian Sch., Inc.*, 477 U.S. 619, 625 n.1 (1986), rejected a ripeness challenge to constitutional claims against state administrative proceedings: "We think that any ripeness challenge to appellee's complaint is foreclosed by *Steffel v. Thompson*, 415 U.S. 452 (1974), and *Doran v. Salem Inn., Inc.*, 422 U.S. 922 (1975). *Steffel* held that a reasonable threat of prosecution for conduct allegedly protected by the Constitution gives rise to a sufficiently ripe controversy. [citation omitted] If a reasonable threat of prosecution creates a ripe controversy, we fail to see how the actual filing of the administrative action threatening sanctions in this case does not.")

24

The possibility that the state proceedings could end favorably for a plaintiff—an illusory possibility for Professor Hook—makes no difference. *Ohio Civil Rights Comm'n v. Dayton Christian Sch., Inc., supra*, 477 U.S. at 625 n.1 ("It is true that the administrative body may rule completely or partially in appellees' favor; but it was equally true that the plaintiffs in *Steffel* and *Doran* may have prevailed had they in fact been prosecuted.")

In general, ripeness requires "a real, substantial controversy between parties having adverse legal interests, a dispute definite and concrete, not hypothetical or abstract." *Nebraska Pub. Power Dist. v. MidAmerican Energy Co.*, 234 F.3d 1032, 1037-38 (8th Cir. 2000), quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979). A real, substantial controversy exists between defendants and Professor Hook, caused by defendants' failure to abide by the First Amendment.

Determining ripeness can require consideration of both "fitness of the issues for judicial decision" and "the hardship to the parties of withholding court consideration." *Nebraska Pub. Power Dist. v. MidAmerican Energy Co., supra*, 234 F.3d 1032 at 1038, quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967). "Whether a case is 'fit' depends on whether it would benefit from further factual development. The case is more likely to be ripe if it poses a purely legal question and is not

25

contingent on future possibilities." *Public Water Supply Dist. No. 10 v. City of Peculiar*, 345 F.3d 570, 573 (8th Cir. 2003). This case poses a purely legal issue: does defendants' stated intent to fire Professor Hook violate his First Amendment rights? The question is not contingent on any future possibilities.

The "hardship prong" of ripeness requires that the plaintiff "has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged statute or official conduct." *Public Water Supply Dist. No. 10 v. City of Peculiar*, *supra*, 345 F.3d at 573, quoting *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974). Professor Hook is in danger of sustaining direct injury because of official conduct: government retaliation for his First Amendment protected speech, and loss of his tenured employment. Professor Hook need not show that "the sword of Damocles" hangs over him. *Iowa League of Cities v. EP*, 711 F.3d 844, 867 (8th Cir. 2013). But were the sword of Damocles the test, Professor Hook would meet it, because his promised punishment is only a few days away.

Finally, the case is ripe because defendants' retaliation against Professor Hook, it allowed to occur, will abridge his First Amendment rights, and any violate of those rights, no matter how brief, is irreparable harm. Only if the case is heard

26

now can irreparable harm to Professor Hook be avoided, as discussed in Section IV.

B. 3. below.

**B.      Professor Hook is entitled to injunctive relief**

**1.      Standards for granting a temporary restraining order**

"[T]he standards for issuing either a temporary restraining order or a preliminary injunction in this circuit are set out in the seminal decision of *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 & n.5 (8th Cir. 1981) (en banc)." *United States v. Barnes*, 912 F. Supp. 1187, 1192 (N.D. Iowa 1996). The *Dataphase* factors are: "(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." *Carson v. Simon,* 978 F.3d 1051, 1059 (8th Cir. 2020).

The most significant factor is the probability of success. *Id.* A party seeking injunctive relief against implementation of a state statute must show that it "is likely to prevail on the merits." *Dakota Rural Action v. Noem*, 416 F. Supp. 3d 874, 892 (D.S.D. 2019), quoting *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 731-32 (8th Cir. 2008) (*en banc*). But no state statute is at issue here, so this higher standard does not apply.

### 2.    Professor Hook is likely to prevail on the merits

Professor Hook exercised his First Amendment rights as a private citizen on a matter of great and immediate public concern.  His words offended political leaders who immediately sought to punish him for his speech.  But speech that some find offensive is fully protected by the First Amendment.  Were it otherwise, political speech that causes hurt feelings or political disagreements would allow the government to retaliate against any of us.  Professor Hook is likely to prevail on the merits, for all the reasons discussed in Sections II and III above.

### 3.    Any loss of First Amendment rights, no matter how brief, is irreparable harm

"'[T]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Mahmoud v. Taylor*, ___ U.S. ___, 145 S. Ct. 2332, 2364 (2025), quoting *Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020).  "This Court has long held that '[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Doe v. Mills*, ___ U.S. ___, 142 S.Ct. 17, 22 (2021), quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion).

### 4.    The other requirements for injunctive relief are met

"When a plaintiff has shown a likely violation of his or her First Amendment rights, the other requirements for obtaining a preliminary injunction are generally deemed to have been satisfied." *Minnesota Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 870 (8th Cir. 2012), quoting *Phelps-Roper v. Troutman*, 662 F.3d 485, 488 (8th Cir. 2011) (per curiam).

The remaining requirements for injunctive relief are "the state of the balance between th[e] harm [to plaintiff] and the injury that granting the injunction will inflict on other parties litigant," and "the public interest." *Carson v. Simon, supra*, 978 F.3d 1051, 1059 (8th Cir. 2020). Granting a temporary restraining order enforcing Professor Hook's First Amendment rights will not inflict any harm on defendants. To the contrary, defendants will benefit by returning Professor Hook to the classroom so he can resume teaching his students, exactly what they sought when they hired him.

"[T]he public interest, as reflected in the principles of the First Amendment, is served by free expression on issues of public concern." *Dakotans for Health v. Johnson*, No. 4:25-cv-04050-CCT, Doc. 68 at 16 (August 29, 2025), quoting *Kirkeby v.*

29

*Furness*, 52 F.3d 722, 775 (8th Cir. 1995). So injunctive relief in this case will serve the public interest.

### C.    A bond should not be required

"The court may issue a . . . temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." F.R.Civ.P. 65(c). But no bond should be required here. Defendants will sustain no costs or damages from a temporary restraining order. Even if defendants could show potential costs or damages, this litigation seeks to vindicate the public interest in enforcing the First Amendment, so a bond should be waived. *Richland/Wilkin Joint Powers Auth. v. United States Army Corps of Eng'rs*, 826 F.3d 1030, 1043 (8th Cir. 2016) (district court did not err by not requiring moving party to post a bond, because the case was public interest environmental litigation).

Courts in this district have not required bonds in First Amendment litigation. *Dakotans for Health v. Noem*, Civ. 21-4045, Doc. 31; *Dakotans for Health v. Anderson*, Civ. 23-4075, Doc. 43 at 34; *Dakotans for Health v. Ewing*, Civ. 23-5042, Doc. 12 at 16.

30

## V.    Will public university professors be free to speak on political issues, or will they be limited to speech approved by the government?

"First Amendment 'freedoms are delicate and vulnerable, as well as supremely precious in our society.'" *Dakota Rural Action v. Noem*, 416 F. Supp. 3d 874, 890 (D.S.D., Western Div. 2019), quoting *NAACP v. Button*, 371 U.S. 415, 433 (1963). "The threat of sanctions may deter their exercise almost as potently as the actual application of sanctions." *NAACP v. Button*, 371 U.S. 415, 433 (1963). Indeed, "First Amendment freedoms need breathing space to survive." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 618-19 (2021), quoting *Button*, supra, 371 U. S. at 433.

Overbroad regulation of speech harms public speech far beyond its effect on any particular person retaliated against. Everyone—university professors, students, citizens—who sees or hears what has happened to Professor Hook is deterred from saying anything that could put them in Governor Rhoden's or Speaker Hansen's crosshairs. No one wants to be next. Professors have families and obligations. They do not to be fired, have to try to find a lawyer, then engage in time-consuming, anxiety-provoking, expensive litigation to try to get their job back. Almost any rational teachers will take a big step back from expressing any opinion on any of the most controversial subjects of the day: Mr. Kirk, the reaction to Mr. Kirk's murder,

31

President Trump and his attempts to remake American society and culture, etc.

*Dombrowski v. Pfister*, 380 U.S. 479, 487 (1965) ("The chilling effect upon the exercise of First Amendment rights may derive from the fact of the prosecution, unaffected by the prospects of its success or failure.")  The outcome of this litigation will significantly affect whether university professors will speak on matters of public debate, especially in times of political challenge and ferment when their voices are needed more than ever.

## VI.    Plaintiff has provided proper notice to defendants

Plaintiff has filed a Certificate of Service establishing that immediately upon receiving file-stamped copies of all documents from the clerk's office, he served them on defendants' attorneys.  So the provisions of F.R.Civ.P. 65 concerning temporary restraining orders granted without notice do not apply.

## VII.   Conclusion

"Professors may say things in public that are mistaken, offensive, or even repugnant and vile—or they may simply say things that threaten the interest of powerful groups and individuals or run contrary to prevailing sentiment—but general principles of free speech protect their right to say such things and university employers should refrain from penalizing them for such speech.  When universities

claim that firing professors who say controversial things is justified, courts should stand ready to closely interrogate such claims. [Even] [w]hen the extramural speech of professors is weighed in a *Pickering* balance, the university's legitimate interest should not include an interest in suppressing speech because it is unpopular or uncivil or gives rise to the commotions that unpopular or uncivil speech can trigger." Keith E. Whittington, *What Can Professors Say in Public? Extramural Speech and the First Amendment*, 73 Case W. Rsrv. L. Rev. 1121, 1174-75 (2023).

This memorandum began with Justice Robert Jackson's classic statement in *West Virginia State Bd. of Education v. Barnette*, 319 U.S. 624, 642 (1943), and it will end there. The defendants acted against Professor Hook to attempt to "prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." Their orthodoxy is that Mr. Kirk was a good person who did good work and who we should honor after his death, and that to speak ill of him renders the speaker unsuitable for continued employment as a university professor.

But Professor Hook has a right to disagree with defendants. The debate about Mr. Kirk's beliefs is for the marketplace of ideas. The First Amendment guarantees the marketplace stays open, The government may not punish people for their ideas.

33

Dated: September 23, 2025          Respectfully submitted,

<u>/s/ James D. Leach</u>
James D. Leach
Attorney at Law
1617 Sheridan Lake Rd.
Rapid City, SD 57702
Tel: (605) 341-4400
jim@southdakotajustice.com
Attorney for Professor Hook